LAW OFFICE OF
# JESSE M. SIEGEL

(Tel) 212-207-9009  
(Fax) 212-619-6742

299 Broadway, Suite 800  
New York, New York 10007

JesseMSiegel@aol.com

February 9, 2023

**BY ECF**

Hon. George B. Daniels, District Judge  
United States District Court for the  
Southern District of New York  
500 Pearl Street  
New York, NY 10007

**Rule 32 Sentencing Memorandum in the Matter of**  
*United States v. Sean Gambrell*, S3 20 Cr. 57 (GBD).

Dear Judge Daniels:

     Sean Gambrell's young life has not been overly blessed with good fortune. Had the gods decided he should be born five or ten miles further north, he might have avoided the potholes that have tripped up so many young, poor black and brown men, like him.

     Even given this fraught beginning, his life has been marked by especially bad luck. Fleeing his violent, physically abusive father, he moved with his mother to Flint, Michigan, where he was at times homeless, and drank Flint water for several years.

     And, even given this unfortunate twist of fate, his luck has been bad, as he had the misfortune of being detained for this offense during a once-in-a- (much longer than his) lifetime pandemic. As a result, he was locked up in a cell for 23 hours a day for long stretches, isolated and without visits, and only occasional opportunities to attend to even the most basic of human needs, like personal hygiene.

     For these reasons, and those set forth below, including, especially, the sentences imposed on similarly-situated co-defendants, we submit a sentence of time served, equivalent to a sentence of about 43 months[1], would be "sufficient, *but not greater than necessary*" to achieve

---

[1] Sean was arrested on February 18, 2020, and has been incarcerated since, a period that will be about 36 months on the date of sentence. Pursuant to Bureau of Prison's policy, inmates are

Hon. George B. Daniels
February 9, 2023
Page 2

the purposes of sentencing set forth in Title 18, United States Code, section 3553(a)(2).  18 U.S.C. § 3553(a) (emphasis added).

We note that Probation's recommendation of a much longer sentence – 70 months – is not only far longer than imposed on similarly-situated co-defendants, and greater than necessary, but also based on incorrect information. Probation incorrectly states that Sean discharged a firearm during the robbery to which he pled guilty,  (Presentence Report ("PSR") ¶ 54), and support their recommendation by saying that his "use of a firearm is troubling."  (PSR at 29.) In fact, however, the gun involved in the robbery was possessed and used by another participant, and was not discharged, but used by the other individual to hit the victim.

**Personal Background**

Even compared to others from similar "socio-economic" backgrounds, Sean's young life has been especially brutal, unstable and impoverished.  Born just 25 years ago, in New York, Sean has scarcely enjoyed even a moment of comfort and ease.  His father was a violent alcoholic, who beat his mother and sister with his fists and belt several times a week.  Sean, being younger, was beaten less often, but was also physically abused, including when he intervened to try to protect his mother and sister.  At times, neighbors called the police and his father was arrested. (PSR ¶ 105.)

Sean and his mother and sister fled his father when Sean was about eight, moving to Flint, MI, to be near his mother's family.  They were destitute, living in shelters and, at times, his mother's car.  They also stayed with an uncle, where there were rats and cockroaches everywhere.  For a period, they had so little food, Sean would go days without eating, and his mother had to beg neighbors and relatives for leftovers. (PSR ¶ 107.)

The neighborhoods in which Sean and his family lived were dangerous and dominated by gangs. As a young boy, Sean witnessed and heard shootings[2] and other violence, and his mother would not let him stay outside after 6:00 p.m.  And, of course, they drank Flint lead-contaminated water.  (PSR ¶ 108.)

Due to the danger, Sean's mother decided to send him to live with his grandmother in the Bronx when he was about twelve.  He remained close with his mother and sister, kept in touch by telephone, and saw them over holidays and during summers.  (*Id.*)

---

entitled to a 15% reduction based on accumulated "good time" credit.  *See* PROGRAM STATEMENT: GOOD CONDUCT TIME UNDER THE PRISON LITIGATION REFORM ACT (2005), ¶6 (Sept. 20, 2007)  http://www.bop.gov//policy/progstat/5884_003.pdf.  Thus, if Sean were sentenced to 43 months, he would serve approximately 36.

[2] During his Presentence interview, Sean reported seeing a neighbor shot and killed.

Hon. George B. Daniels
February 9, 2023
Page 3

Sean first smoked marijuana at the age of 9, and developed an everyday, all-day habit that continued until his arrest here, at the age of 22. He has also drunk alcohol, which he does not particularly like, and tried codeine and promethazine when he was 18. He has not had substance abuse treatment. (PSR ¶¶ 118-19.)

While in Flint, Sean was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed Ritalin, but stopped taking it, as he does not like how it makes him feel. He also saw a therapist and was prescribed Ritalin in New York in about 2012, but again stopped taking it. He reported that he still had difficulty paying attention and getting distracted. Moreover, he experiences anxiety and has seen a therapist at MDC Brooklyn, who advised he likely suffers from depression. He believes he would benefit from mental health treatment when he is released. (PSR ¶¶ 115-16.)

In school, Sean was placed in special education classes and resource room, due to special needs, including ADHD. He attended Lehman High School in the Bronx for three years, but received a "safety transfer" when he was jumped by gang members who mistakenly thought he was a member of a rival gang, and slashed his right arm with a knife; he has a visible scar that runs the entire length of his forearm. He attended night school and received a high school diploma from James Monroe High School in September 2018, at the age of 21. (*See* Exhibit A, attached hereto; PSR ¶¶ 113, 120-21.)

When he has had the opportunities, Sean has demonstrated a strong work ethic. From 2017 until his arrest here, he worked as a chef at Citi Field during baseball season and at special events. He also worked part-time as a mentor at James Monroe Educational Center from 2018-19, as a marketing associate at Exploria Resorts in Manhattan in 2017, and, briefly, as a delivery driver at AWS in Brooklyn, in 2017. (PSR ¶¶ 124-27.)

Also demonstrating his work ethic, Sean has taken several courses and earned certificates during his time at MDC Brooklyn, although such programming was not available for much of his time there, due to the coronavirus pandemic. These include courses in Recreation and Leisure – Sentry Course, Developing Creativity, Conflict Resolution, Business Acumen, and Personal Health Journal. (PSR ¶ 29; *see* Exhibit B, attached hereto.)

Sean does not have a long criminal history. In 2022, he was sentenced to a three-year conditional discharge for a 2018 attempted robbery that is part of the offense charged here. (PSR ¶ 98.)

By far the most positive things in Sean's life have been his relationship since 2019 with his girlfriend, Janae Wright, and the birth of their now two-year-old son, "BG." BG was born while Sean was at MDC Brooklyn, and, due to the pandemic, Sean was unable to meet him until he was about 1. Janae is a nurse's assistant, who has been struggling financially, especially after her home burned down recently, and without Sean being able to assist her. (PSR ¶ 109.) The extent to which they are committed to each other is demonstrated by the sad circumstances their

Hon. George B. Daniels
February 9, 2023
Page 4

relationship has had to endure.  They look forward to living together as a family whenever Sean is released.

### The Offenses, Guilty Plea and Plea Agreement

Sean was arrested on February 18, 2020, and charged with participating in a racketeering conspiracy involving the "59 Brims."  He was charged in seven counts of the 24-count indictment, with participating in the racketeering conspiracy (Count 1); with others, attempting to murder and assault individuals during a robbery on May 21, 2019 (Count 13); with others, using, carrying and possessing a brandished and discharged firearm (Count 14); with others, assaulting an individual with a dangerous weapon while robbing him, on November 29, 2018 (Count 18);  with others, using, carrying, and possessing a brandished firearm in connection with the robbery on November 29, 2018 (Count 19); conspiring to distribute drugs (Count 20); and using, carrying and possessing a firearm in connection with the narcotics conspiracy (Count 21).

On July 16, 2022, Sean pled guilty pursuant to a written agreement with the government, to Count 18 of the indictment.  He admitted that, on November 29, 2018, he participated in a robbery with other individuals, during which one of the other individuals hit the victim with a gun.  (*See* PSR ¶ 84.)

In their plea agreement, the parties stipulate that Sean's base offense level is 20, pursuant to U.S.S.G. § 2B3.1(a).  This is increased by 6 levels because a firearm was used, pursuant to § 2B3.1(b)(2)(B), and 4 levels because the victim sustained serious bodily injury, pursuant to § 2B3.1(b)(3)(B).  The resulting adjusted offense level of 30 is reduced by 3 levels for Sean's timely acceptance of responsibility, pursuant to § 3E1.1(a) and (b).  This yields a total offense level of 27, and an advisory sentencing guidelines range, in criminal history category I, of 70 to 87 months.  (PSR ¶ 28.)

Sean has been detained since he was arrested, a period that will be about 36 months on the date of sentence.

### The Presentence Investigation Report

Objection to the PSR

Probation incorrectly states that Sean possessed and discharged a firearm during the robbery charged in Count 18, to which he pled guilty.  (PSR ¶ 54.)  Sean did *not* possess or use the gun involved in that robbery, and it was *not* discharged.

Guidelines and Recommendation

Probation's advisory guidelines calculation concurs with that stipulated by the parties in

the plea agreement.  (PSR ¶¶ 86-96, 99-100, 131.)

Probation recommends the Court impose a 70-month sentence on Sean, despite noting his reported "difficult upbringing due to an abusive and alcoholic father." They also recognize that, after fleeing him, Sean and his family "found themselves in Michigan, homeless and sleeping in shelters or cars, going days without eating, and begging neighbors for food," in an area that "was crime ridden [in which] the defendant would hear shootings and witness violent acts daily." (PSR at 29.)  Probation does not address the need to avoid unwarranted sentencing disparities with similarly situated co-defendants.

We respectfully submit Probation appears to have been unduly influenced by their incorrect understanding that Sean personally possessed and discharged a firearm.

### Exhibits

Attached hereto are:

- Exhibit A, a copy of Sean's high school diploma;

- Exhibit B, certificates from courses that Sean completed at MDC Brooklyn;

- Exhibit C, letters from people who know Sean; and

- Exhibit D, a table showing the sentences the Court has imposed on co-defendants as of February 9, 2023.

### Sentencing Under Section 3553

The Court is required to impose a sentence that is "sufficient, *but not greater than necessary*" to achieve the purposes of sentencing set forth in Title 18, United States Code, section 3553(a)(2).  18 U.S.C. § 3553(a) (emphasis added).  The Second Circuit has underlined this requirement: "Plainly, if a district court were to explicitly conclude that two sentences equally served the statutory purpose of §3553(a), it could not, consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

Thus, a court is to impose the *shortest* sentence that accomplishes the purposes of sentencing.

In determining a sentence, the Court shall consider the factors set forth in section 3553(a), including:

> (1) the nature and circumstances of the offense and the history and

> characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to promote just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant, and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> …
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

The Second Circuit has emphasized, "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in Section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

We respectfully submit that, in light of Sean's history and characteristics, the terribly harsh conditions of his pre-trial confinement during the coronavirus pandemic, and the sentence imposed on his co-defendants, a sentence of time-served, equivalent to a term of imprisonment of about 43 months, would be "sufficient, but not greater than necessary" to achieve the various purposes of sentencing.

The history and characteristics of the defendant.

If no excuse for his actions, it can hardly be doubted that the bad decisions Sean made were the direct result of his sad history and bad judgment resulting from early and excessive use of marijuana. The poverty, deprivation, abandonment and brutality he experienced throughout his childhood stand out even when compared to the experiences of others from similar

Hon. George B. Daniels
February 9, 2023
Page 7

backgrounds.

While some people escape such tragic circumstances and go on to lead productive lives, the trajectory of Sean's life was set at birth. To recognize this as mitigation is not to excuse his offenses. The miserable childhood and adolescence Sean suffered are relevant not merely because he deserves sympathy and a break, but also because the circumstances he endured are directly related to the crime that brought him before the Court. Indeed, it might have been more surprising if Sean had not wound up living the life he did.

It should also be noted that Sean was, when he committed these offenses, extremely young. He was 21 when he committed the robbery to which he pled guilty, 22 when he was arrested, and, after three years in jail, is still only 25 years old. While old enough to be treated as an adult, such a young person- even a sober one without mental health problems - does not have the maturity and life experience of an older person, and cannot be expected to exhibit the judgment of an older person. *See, Gall v. United States*, 552 U.S. 38, 57-58 (2007); *Johnson v. Texas*, 509 US 350, 367 (1993); U.S.S.G. section 5H1.1. In *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), the Supreme Court held that, except in rare circumstances, juveniles cannot be sentenced to life without parole, based largely on scientific studies showing that young brains are not fully developed in areas relevant to criminal responsibility until the mid-twenties, which Sean is only now reaching.

But Sean's personal history and characteristics also provide much reason to hope that he can succeed in turning his life around. Despite his learning disabilities, he is a bright and engaging young man who has demonstrated a strong work ethic. He earned a high school diploma at the age of 21. (*See* Exhibit A.) In her letter[3], his aunt, Jovanna Encarnacion, describes how Sean helped out during her second pregnancy by picking up her first child from school. She continues, "Towards the end of my pregnancy Sean graduated from High School and it was a mission, he attended night school and all just to make sure he graduated and never gave up."

Ms. Encarnacion says that "Sean is the sweetest and most kind hearted person I know." She describes how he helped her take care of her puppy, by feeding, bathing, and walking it. He also went to the supermarket for her parents, and helped her with her first child, by playing with her, helping to make her bottles, and pushing her stroller while Ms. Encarnacion was going to do laundry. Like many of those writing on his behalf, she mentions him playing football.

Keith Spivey, President of the Bronx Buccaneers Youth Football Organization, describes how Sean and others were "surrounded by a lot of bad influences because they lived in a very deprived part of the Bronx." Yet, Sean "never missed a game or a practice," and "performed admirably on the football field and helped our team win several championships." He also stayed in touch after finishing the program, and helped younger children learn how to play football. Mr. Spivey says, "Sean was adored by the youngsters because he was only a little older than them

---

[3] All letters referenced here are included in Exhibit C.

and could understand what they were going through. Sean would talk to children who were having problems at home or at school."

Karim McFarlane, a college women's basketball coach and Adjunct Professor at Westchester Community College, got to know Sean as an opponent, a member of the Buccaneers youth football team. He says Sean "has always been a respectful young man on and off the field." Further, "Sean was a fun-loving silly kid that would always be jovial and telling jokes. He loved the sport of football but what caught my attention was how respectful he was to his coaches and particularly to ladies that were involved with running the Bronx Buccaneers program."

Leslie Alvira also got to know Sean through youth football, and found him to be "a down to earth guy, very respectful and loved playing football." She describes how he "would take the time to teach my son football, show up to my sons games and cheer him on." He "became family," treated her son "like he was his own little brother," and told her he was "working and trying to stay positive to make his grandparents proud."

The mother of a friend, Chanda Marcus, describes Sean as "an individual who shows up earlier than asked, works hard, [and is] an amazing football player." Moreover, "Sean carries his self in a polite, respectable manner."

These letters from people who know him best demonstrate that Sean's character is not defined solely by his crimes. Despite suffering almost unimaginable deprivation, he has demonstrated his respectful and caring nature, and the ability to work hard and improve himself when given the chance. He has also demonstrated this by the certificates he has earned at MDC Brooklyn. (*See* Exhibit B.)

The nature and circumstances of the offense.

We do not mean to minimize in any manner the seriousness of the offense to which Sean pled guilty. There can be no question that the activities of violent drug gangs have tremendously negative effects on individuals and communities, and that the robbery to which Sean pled guilty was extremely serious.

The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to promote just punishment for the offense.

Given the length of sentences often imposed in federal court, it is sometimes hard to appreciate that the amount of time Sean has already spent in jail – about 36 months, or the equivalent of a sentence of about 43 months – constitutes a long sentence, especially for someone who has not previously been in jail. We submit that a sentence of time served would reflect the seriousness of the offense, and promote respect for the law and just punishment.

Moreover, the *relative harshness* of this confinement bears on sentencing, insofar as one of the purposes of sentencing is to afford just punishment for the offense and respect for the law. 18 U.S.C. §3553(a)(1). For the last 36 months, Sean has been confined in pre-trial detention at MDC Brooklyn, a jail, like MCC Manhattan, not "designed for long term stays." *See United States v. Behr*, 2006 WL 1586563 *5 (S.D.N.Y. 2006) (Sweet, J.) (further noting that harsh conditions at MCC were recognized by Judge Kimba Wood as a basis for a substantial sentence reduction). Even under the best of circumstances, inmates' movements are severely restricted at all times. They have little opportunity to participate in social programs; very limited access to personal development programs, exercise, physical training, or recreation; and almost no opportunities to be outdoors.

The last few years, of course, have presented the *worst* of circumstances. Due to the coronavirus pandemic, Sean has endured conditions so harsh that they were not, prior to the pandemic, routinely imposed on prisoners convicted of even the most serious offenses.

For most of 2020 and some of 2021, Sean was confined to his cell for at least 23 hours per day, and, for some of that time, was not even allowed out of his cell every day. He was essentially in solitary confinement. He was only allowed to shower and attend to his personal hygiene every few days. He had no visits for most of a year, and was unable to meet his newborn son until he was about one year old. He was severely restricted in his ability to even call his family. There were no opportunities to exercise and no programs to attend. He had no access to the law library, to review the electronic discovery in his case. He had no access to the commissary, and thus was limited to the personal hygiene products and food provided by the jail.

The Supreme Court has recognized that because pre-trial confinement is an administrative, as opposed to judicial, form of detention, the conditions of confinement may not rise to the level of punishment. *Bell v. Wolfish,* 441 U.S. 520, 537-38 (1979). But, as Judge Weinstein observed, "The inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe." *United States v. Gallo,* 653 F.Supp. 320, 336 (E.D.N.Y.1986).

Even pre-*Booker*, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*), because harsh conditions of confinement could be regarded as a mitigating factor pursuant to U.S.S.G. §5K2.0. *Id*. (internal citation omitted.) Similarly, sentencing judges have based downward departures on findings of unduly harsh conditions of pre-trial confinement. *See, e.g., United States v. Francis*, 129 F.2d 612 (S.D.N.Y. 2001) (Patterson, J.) (Departing one level because of harsh conditions of pre-trial confinement endured by illegal reentry defendant for 13 months at Hudson County Correctional Center). Post-*Booker*, concerns that authorized departures from the sentencing guidelines when they were considered mandatory may now justify non-guidelines sentences pursuant to Title 18, United States Code, section 3553(a).

Many courts have recognized the impact of restrictions imposed in jails and prisons to

Hon. George B. Daniels
February 9, 2023
Page 10

control the spread of COVID-19 on the harshness of the punishment imposed. In *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277 at *5 (S.D.N.Y. Jan. 15, 2021), for example, Judge Engelmayer noted, "[A] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing." *See also*, *United States v. Ciprian,* No. 11 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb 1, 2021)(same). In *United States v. Daniel Gonzalez*, No. 18 Cr. 669, Doc. No. 250 at 17-18 (S.D.N.Y. Apr. 2, 2021)**,** Judge Oetken found that time served at MCC Manhattan during the pandemic was "essentially the equivalent" of 1 and ½ or 2 times time served not during the pandemic.

Finally, it (hopefully) goes without saying that just punishment does not include exposing a person to a disease that can have serious, negative long-term effects on their health, and even cause death. While, fortunately, Sean has not contracted COVID, he has had to live with the anxiety of catching a deadly disease, in a facility in which many of his fellow inmates came down with it. Going forward, Sean, like all inmates, will be at increased risk while imprisoned because of the impossibility of social distancing while incarcerated.

The need to avoid unwarranted sentencing disparities

A sentencing court is also to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. section 3553(a)(2)(6). It is often difficult to determine who is similarly situated, especially for defense counsel, as we do not have access to other defendants' Presentence Reports. However, review of documents in this case, including both the PSR and the government's sentencing submissions as to co-defendants, strongly support the sentence requested – time served, equivalent to a 43-month term of imprisonment - and suggest a longer sentence would represent an unwarranted sentencing disparity.

Attached hereto as Exhibit D is a table setting forth the terms of imprisonment imposed by the Court so far on Sean's co-defendants. The Court has imposed below-guidelines sentences on every defendant except those facing mandatory minimum sentences for gun charges, on whom the Court has imposed the mandatory minimum sentences.

Significantly, the Court has sentenced nine co-defendants *described by the government as leaders* of the 59 Brims (unlike Sean). Four of these have received sentences below that requested for Sean: Albert Shoulders (42 months); Ranell Sloan (33 months); Darnell Cooper (27 months); and Markell Bobian (38 months). Two others received sentences only slightly longer than the sentence requested for Sean: Jose Rodriguez (48 months); and Robert Baley (51 months).

According to the government, Baley "wielded enormous power within the United Bloods Nation," and "had the ability to control all activities for the 59 Brims, both inside and outside of

Hon. George B. Daniels
February 9, 2023
Page 11

prison." Further, according to the government, "Although Willie Evans was the Godfather of the 59 Brims, Evans ultimately reported to Baley." (ECF Doc. No. 539 at 2.)

Rodriguez held the second and third highest ranks within the 59 Brims, the "High 020" and "Low 020," according to the government. They argued he "regularly possessed firearms and distributed drugs," and "served as a supply source of drugs for the gang," and said his "high-ranking status in the gang is corroborated by his presence at the murder of Bradford Mensah." (ECF Doc. No. 359 at 2.)

The other co-defendants characterized by the government as leaders who received longer sentences – Timothy Coleman, Jerlaine Little and Marcus Ayala - had significantly higher advisory guidelines ranges, accounting for their higher sentences.

In short, the sentences imposed on Sean's co-defendants, especially those characterized by the government as leaders, and the need to avoid unwarranted sentencing disparities, provide powerful support for the sentence requested.

## Conclusion

For the foregoing reasons, we respectfully ask the Court to sentence Sean Gambrell to time-served.

Respectfully Submitted,

/s/
Jesse M. Siegel
*Counsel to Sean Gambrell*